### THE FRED E. HASLER.

District Court, S. D. New York.
Jan. 4, 1932.

See, also, 51 F.(2d) 779.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight, of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, of New York City, of counsel), for claimant.

FRANK J. COLEMAN, District Judge.

1. The principal question is whether libelant had title to the oil which was lost. On May 5, 1928, the libelant purchased from the Rosshavet Company the cargo of whale oil to be produced on board the steamship Ross in the Antarctic. On April 15th of the following year the steamer arrived at New York, where she was placed at a pier and commenced discharging her cargo into a barge chartered by the libelant for carriage to libelant's plant at Port Ivory, Staten Island. The barge sank before she was discharged at Port Ivory, and under the interlocutory decree libelant is entitled to recover from the barge owner for breach of warranty of seaworthiness. If libelant had title to the lost oil, it should of course recover compensatory damages. If, however, the title still remained in the seller, the respondent contends that the libelant can recover only nominal damages for the breach of warranty of seaworthiness.

The question of whether title had passed to the purchaser at the time of the loss is controlled entirely by the mutual intention of the parties to the sale, and this is to be determined from the terms of the contract, the conduct of the parties, and the surrounding circumstances. It is appropriate to state that I have been unable to feel any response to the libelant's emotional appeal. It has seemed to me that the question was to be decided without any particular satisfaction to the court in arriving at one conclusion rather than another. The real importance of it arises from a possible limitation of liability by the respondent pursuant to the federal statute, and I have been unable to see why the court should strive to aid the insurance underwriters who are conducting this litigation in the libelant's name in their effort to avoid the effect of that statute. Whatever error I may have made in arriving at a final conclusion has not been induced by a desire to have the underwriters recover in a form of action which might make a limitation of liability impossible.

The contract of sale provided that the oil was to be delivered by the seller "on c. i. f. terms" at any United States eastern or gulf port designated by the purchaser. One circumstance which should be borne in mind in construing the contract was that in the port of New York the steamer could not discharge directly into tanks on the land, whereas that could be done at other ports. The delivery was to be at such quay or berth as directed by the buyer, and the discharge to be made by the ship's pumps into the buyer's tanks or cars placed alongside. The discharge was to be commenced within twenty-four hours after the ship had been cleared at the custom house and was to proceed as fast as the ship could deliver. The cost of placing receiving tanks alongside the ship, the wharfage charges, and the import duties were all to be borne by the purchaser. Omitting for the moment clause 13, which will be considered more in detail later, it is plain that the seller completely performed its obligation as to physical delivery by bringing its ship to the berth designated by the purchaser and by operating its pumps so as to discharge the oil into tanks placed alongside by the purchaser at its own expense.

The purchase price provided in the con-

tract was different amounts per ton, depending upon the quality of the oil. It was contemplated that the cargo would be of different grades and of undetermined quantities; consequently it was agreed that the purchaser would have the right to examine and sample the oil before or during the discharge for the purpose of ascertaining the different grades, and that the cost of sampling and analysis would be for their mutual account. The purchaser had the express right to reject all but certain specific grades, and the total purchase price was to be figured "nett delivered weights."

The payment of the purchase price was to be made as follows: 75 per cent. of the approximate net value of the cargo upon presentation of the bill of lading, invoices, and insurance policies, after the ship had been cleared at the custom house; and the balance when the cargo was weighed after its delivery. Upon the arrival of the ship the documents were presented to the purchaser, a certain examination of the cargo was made, and the purchaser paid 75 per cent. of the estimated price for the entire cargo before the discharge was commenced.

The contract also contained the clause, "ship lost, contract void, or if any portion of the cargo be lost in transit, contract void in respect of such portion."

Considering only the above facts, there would be no doubt but that title to the lost oil passed to the libelant, at the latest, when the oil was put into the barge. In the absence of clause 13, that discharge would have constituted a completed delivery. The barge, which had been chartered by the purchaser in its own name and at its own expense, was for present purposes the same as though owned and operated by the purchaser. With the oil delivered into the possession and control of the buyer who had paid 75 per cent. of the purchase price and had received the documents of title, all in accordance with a c. i. f. contract, there would be no reason to suppose that they intended the seller to retain title, even though the exact adjustment of the price was to await weighing. On the contrary, the presumption of passage of title would be extremely strong.

Now considering the effect of clause 13, it appears that in the printed form of contract that clause originally read, "The seller's responsibility for the cargo to cease successively with delivery over the ship's side." It will be noted that this confirms the strong presumption which would otherwise have arisen, that title would pass to the purchaser at the latest upon discharge of the oil into the latter's possession. The parties retained this clause, but added to it, "but if discharging takes place in New York, seller's risk not to cease until oil has been delivered at scales at buyers plant 'Port Ivory,' Staten Island, N. Y. or at scales at other railroad terminal within district of port of New York.' Ordinarily, in a sales transaction, the risk of loss rests upon the party having title, and the respondent contends that the addition to clause 13 indicates an intention that title remain in the buyer until the oil was transported to the scales. The courts have recognized, however, that in a sale the ultimate risk of loss may be divorced from title, if such is the actual intention, and that the party bearing it is in the position of insurer to the party having title. The Elgee Cotton Cases, 22 Wall. (89 U. S.) 180, page 194, 22 L. Ed. 863; Donlan v. Turner, etc., Co. (C. C. A.) 282 F. 421, page 424; Williston on Sale (2d Ed.) § 302.

In determining what the intention was in adding the new part to clause 13, it should be noted that it is not worded in the form of an exception to the original term, but as an additional term, and the "responsibility" of owner which accompanies title may, perhaps, have been contrasted with the "risk" of insurer. On the other hand, the risk was not to "cease" until the oil was "delivered" at the scales, which might be construed as indicating that the risk had antedated the discharge and was therefore not an insurer's risk, but an owner's; and that the delivery by the seller to the purchaser could take place only at the scales notwithstanding that the oil had been discharged into the latter's barge.

The clause in itself is ambiguous, but is, I believe, consistent with the strong presumption which the law would have raised in its absence that title passed at the discharge into the barge. The new part was added solely for the benefit of the purchaser, and it does not seem probable that the parties in adding it intended to retain ownership in the seller after the documents had been transferred, the oil had been placed in the purchaser's barge, and 75 per cent. of the price had been paid, especially since the purpose which they had in mind could have been accomplished just as well without such retention of title.

After the loss occurred, various subordinates and representatives of the parties made statements and agreements which were based on the assumption that, as between the parties to the sale, the loss ultimately rested on the seller, and not on the buyer; but that is

not inconsistent with libelant's theory that title had passed to the buyer and; the seller's risk was that of an insurer. It is immaterial that these subordinates and representatives may have used words infelicitously in expressing the relationship because their ultimate acts are consistent with title in the purchaser. For instance, the seller allowed the purchaser the full price of the lost oil, not because the sale had not been consummated, but because the seller had assumed the risk of loss. Similarly the seller had incurred the expense of insurance on the transportation from the ship to the pier, not because it was the owner during that period, but because it was under the risk of loss.

2. But even if libelant did not have title, it did, I believe, have a substantial interest in the oil and a relation to it which would justify a recovery for the loss in this action. It had paid 75 per cent. of the purchase price of the entire cargo upon indorsement to it of the bill of lading and other documents, had incurred the expense of transporting the oil from the ship, and was both the charterer of the barge and the consignee of its cargo. Under these circumstances admiralty would not, I believe, restrict libelant to nominal damages, but would permit a full recovery for the breach of warranty.

3. Both libelant and respondent except to the findings of the quantity of oil lost and of the value per pound. These figures necessarily were estimates, and the methods adopted by the special commissioner in determining them were as reasonable as any of the alternatives suggested. Absolute accuracy was of course impossible, and I am not convinced that other figures would have been nearer to the truth.

The exceptions are therefore overruled, and the report confirmed.